## STATE v. J. P. McCULLOUGH.[1]

November 29, 1907.

Nos. 15,503—(27).

**Bastardy.**

The evidence in an action charging the defendant with bastardy examined, and *held* not sufficient to sustain the verdict.

Defendant was charged with being the father of complainant's bastard child. The case was tried in the district court for Waseca county, Buckham, J., and a jury which rendered a verdict of guilty. From an order denying his motion for a new trial, defendant appealed. Reversed.

*L. D. Rogers, H. J. Peck,* and *John Moonan,* for appellant.

*A. S. Maloney,* County Attorney, and *P. McGovern,* for the state.

ELLIOTT, J.

The jury found that the defendant is the father of the complainant's bastard child, and the appeal is from the order denying a motion for a new trial.

A very careful study of the record convinces us that the verdict is manifestly and palpably contrary to the great weight of the evidence. The burden rested upon the state to prove its case by a fair preponderance of the evidence. Independent of corroborating circumstances and testimony, the evidence of the girl was entitled to the same, but no more, weight than that of the defendant. If of equal credibility, one offsets the other, and the defendant should have been found not guilty. The conceded facts and circumstances render utterly improbable the uncorroborated statements of the complaining witness that the defendant was the father of her child.

The defendant was fifty years of age, the father of eight children, and at the time alleged was living in friendly relations with his wife and family at Janesville, Minnesota, where he was, and for three years had been, rector of the Episcopal Church. He had been a min-

1 Reported in 113 N. W. 1059.

ister for twenty three years, and was a man of good character and standing, so far as the evidence disclosed. The complaining witness, a young woman about twenty three years of age, was a servant in the defendant's family. She had worked there during 1904, and again in 1905. It is not claimed that there had been any acts of familiarity between the parties, or any unbecoming conduct on the part of the defendant, unless found in the statement of the complaining witness that he once pinched her arm, which was denied by the defendant. The house in which the parties lived had one bedroom downstairs and three bedrooms upstairs. The defendant, with three small children, occupied a downstairs bedroom, and his wife and other children slept upstairs. During the cold weather the complaining witness slept downstairs in a room which, during the daytime, was occupied by the defendant as a study.

The complainant testified that on March 4, 1906, while the entire family was present in the house, the defendant entered her room without any previous solicitation or arrangement and had intercourse with her; that it was about twelve o'clock at night; that she made no outcry, and merely told him to let her alone. The story as told by her is very improbable, especially in view of her statement that there had been no previous improper relations between them and that she was a virtuous girl. While her lack of virtue and consent to the intercourse would be no defense in this case, the fact that she made no outcry or disturbance, such as would have been natural under the circumstances, has an important bearing upon her credibility. The defendant's wife left the next day for a prearranged visit with friends, and the complaining witness testified that on the night of March 8 the defendant, under practically the same circumstances, again entered her room and had intercourse with her. At that time all the members of the family, except the defendant's wife, were present in the house. On April 17, a little more than a month thereafter she was informed by the doctor that she was pregnant, and two hundred sixty one days from March 4 she gave birth to a fully developed child. This is the state's case. It rests upon the statements of the girl and the birth of the child. The defendant denied that he had ever had intercourse with her, or ever entered her room under any such circumstances as detailed by her. Both the defendant and his wife tes-

tified that on the night of March 4 they were in the defendant's bed-room downstairs with a sick child until three o'clock in the morning.

During the time referred to, and for several months immediately preceding, the complaining witness was engaged to a young man named Fred Prail, who was in the habit of visiting her at least once a week and remaining with her in the bedroom until a late hour at night. Both she and Prail admitted that they spent the time each night lying upon the bed under conditions which at least strongly suggest improper relations. The complaining witness testified as follows: "Q. But, after the family went to bed, you and Fred were the only ones that were up in the house in this room—isn't that right? A. Yes. Q. And you sat on the bed? A. Yes. Q. And did you lay on the bed? A. We didn't lay just straight down. Q. How did you lay—lay across the bed? A. Yes. Q. What? A. Yes. Q. Didn't you lay up and down lengthwise of the bed? A. No; we didn't. Q. What did you put your head on when you lay across the bed? Take the pillows down and place them on the back side of the bed, so you could lay your heads on? A. No. Q. What? A. Not that I know. Q. You don't remember about the pillows? A. (No answer.) Q. Isn't it true that when you and Fred got onto the bed that you would put the pillows on the back side of the bed and you would lay across the bed, his head on one pillow and your head on the other pillow? A. I only had one pillow. Q. Well, then, both heads laid on the same pillow—isn't that true? A. (Witness smiles, but makes no answer.) Q. Did he have his arm around you while you were laying on the bed that way? A. No; he didn't. Q. He didn't? A. No, we didn't lay so close together. Q. Do you remember pretty well whether he had his arm around you sometimes, around your neck, and you lay with your head on his arm—isn't that true, sometimes? A. Yes. Q. Of course it is true. How long did you do that? How many months did you keep that up, you and Fred? A. So long as I went with him. Q. So long as you worked at Mr. McCullough's? A. No; for about four years. Q. Fred was going to marry you, wasn't he? A. Yes. Q. When you were lying on the bed there during these nights after McCullough's folks had gone to bed, what were you doing? A. We was talking. Q. And you had been doing the same thing there for three or four years, hadn't you,

the same way, when he used to come to see you? A. Yes. Q. When you were lying on the bed these times that he came to see you, didn't he bring any candy or gum or anything? A. Sometimes. Q. Then, when you were lying on the bed across there, you were eating candy, or chewing gum, or something of that kind? A. Yes. Q. Now, you say that Mr. McCullough pinched you once? A. Yes. Q. Well, only once? A. Once or twice. Q. Could you tell which, whether once or twice? A. No. Q. And you are pretty sure that he pinched you, you haven't forgotten about it? A. No; I didn't. Q. But, during all that time that you lived with him, he pinched you, you are sure that he pinched you, once. A. Yes. Q. Well, Mr. McCullough was a good, pleasant man in his family, wasn't he? A. He might be all right in his family. Q. And you had a pleasant time all the time that you lived there? A. I done my work. Q. Did you tell Mr. McCullough and his wife that you were engaged to Mr. Prail and going to marry him? A. No, I didn't tell him."

Fred Prail testified as follows: "Q. Did you visit Ida at Mr. McCullough's place in Janesville? A. Yes. Q. What time was that, what year was that, if you know, Mr. Prail? A. I guess it was in 1904. Q. Was that shortly before you were going to be married? A. Quite a while before that. Q. How often would you visit Miss Flitter there, at Mr. McCullough's there? A. Oh, sometimes once a week. Q. Did you ever have any sexual intercourse with Miss Flitter at any time? A. No, sir."

Cross-examination: "Q. Were you in the courtroom yesterday and heard Miss Flitter's testimony? A. Yes. Q. During the time that she was there at work for Mr. McCullough you visited her regularly about once a week? A. Yes. Q. And during the last four months that she was there, the last time that she went there, where was her room that she occupied? A. Well, I guess his study room. Q. What time did you usually get there in the evening? A. Between seven and eight o'clock. Q. And you usually went into this room? A. Yes. Q. You didn't usually get there till the work of the family was done, did you? A. No. Q. And when you went there you and Ida retired to this room called the study? A. Yes. Q. And you remained there with her until you got ready to go home? A. Yes. Q. And in that room there was a bed, wasn't there? A. Yes. Q.

And you and Ida would lie on the bed? A. Sometimes. Q. Well, which way did you lie on the bed, lengthwise or crosswise? A. Crosswise. Q. You were always crosswise of the bed? A. Yes. Q. How wide a bed was it—an ordinary bed? A. It was a kind of a folding bed. I never measured how wide it was. Q. But it was the ordinary width of a bed? A. Yes. Q. How many pillows were there on the bed? A. One. Q. And when you laid down on the bed, what did you do with the pillow? A. Set them crosswise of the bed. Q. Now, that was during the entire winter and spring of 1905 and 1906, up to about the tenth of March, wasn't it? A. Yes, sir. Q. How late did you usually stay? A. Until eleven o'clock. Q. Did you carry a watch? A. Yes, sir. Q. Did you look at your watch usually? A. Yes, sir. Q. About what time did the family go to bed? A. Well, between ten and eleven. Q. Was the door shut in this room? A. It wasn't shut. It was closed a little; about half ways. Q. Was there a bolt on the door? A. That was more than I know. Q. But the door was closed, so that you and she were alone there in that room on the bed? A. Closed it part way, so that the little kids wouldn't come in. Q. So the little kids wouldn't come in? A. Yes. Q. Sometimes you stayed later than eleven o'clock, didn't you? A. A little. Q. Did you go to sleep usually? A. No, sir. Q. What were you doing lying across the bed there? A. Talking. Q. How long were you usually on the bed? A. Depends on how long we sat there. Q. Well, what were you doing when you were lying on the bed? A. Well, we was eating candy or chewing gum. Q. Who furnished the gum, you or she? A. Of course I did. Q. And you didn't do anything but chew gum? A. No. Q. Now during that time Ida was in good health? A. Yes. Q. And you was in good health? A. Yes. Q. You were both healthy and lying on the bed usually from two to three hours, is that right? A. No. Q. Did you have your arm around her when you were lying on the bed? A. No, sir. Q. Did you kiss her? A. Sure, I did. Q. And you didn't have your arm around her? A. Sometimes. Q. Did you have more than one arm around her? A. No, sir. Q. Did she have her arm around you? A. No. Q. And still you didn't do anything? A. No, sir. Q. No—you say you were engaged to marry her. How long had you been engaged to her? A. Since Christmas, about. Q.

That is, in December? A. Yes. Q. And how long had you been keeping company with her before that? A. About four years. Q. And you didn't get engaged until Christmas? A. No. Q. You are married now? A. Yes, sir. Q. When were you married? A. Sixth of February. Q. Sixth of February? A. Yes, sir. Q. And you live out there in that neighborhood? A. Yes, sir."

The defendant's son, a young man about nineteen years of age, testified that he returned home about two o'clock one morning, and, upon entering the study room to obtain some clothes which he intended to wear the next morning, saw Prail and the complaining witness lying upon the bed with covering over them, sound asleep. Another witness, a young lady who was staying for a time at the McCullough house, testified that she entered the room one evening between nine and ten o'clock, and that they were sitting on the bed, and that the room was dark.

The evidence to which we have called attention discloses the circumstances surrounding the parties. When we consider the character of the defendant, his family relations, the presence of the family in the house, the relations between the girl and Prail, the circumstances under which the intercourse is alleged to have taken place, and the time when the child was born, it is very clear that a verdict which rests upon the uncorroborated statements of the girl is against the weight of evidence. The state did not prove by a fair preponderance of the evidence that the defendant was the father of the child.

The order is therefore reversed, and a new trial granted.